[Crim. No. 3025. Second Appellate District, Division One.—February 15, 1938.]

THE PEOPLE, Respondent, v. THOMAS W. DANIELS, Appellant.

H. A. I. Wolch and G. Vernon Brumbaugh for Appellant.

U. S. Webb, Attorney-General, R. S. McLaughlin, Deputy Attorney-General, Buron Fitts, District Attorney, and Logan Lindley and H. L. Arterberry, Deputies District Attorney, for Respondent.

WHITE, J.—The defendant has appealed from a judgment pronounced against him and from an order denying his motion for a new trial following his conviction of several offenses alleged to have been committed by him by an indictment which contained seven separate counts; I, IV and VI thereof charging grand theft, while counts II, V and VII alleged specific violations by the defendant of the Corporate Securities Act. During the trial, count III was dismissed. The jury returned separate verdicts finding the defendant guilty on all counts submitted to them.

The first contention advanced by the appellant relates to the offenses alleged in counts II, V and VII. The last-mentioned counts in effect charged that appellant sold and issued designated securities without a broker's license permitting him so to do. The securities in which appellant thus dealt are described in the indictment as certificates of interest in a mining title, although the evidence shows that the instruments in question, if securities at all, were certificates of interest in an oil title. The record shows that as a necessary part of its case, in attempting to prove the commission by appellant of the offenses alleged in the last-named three counts, the prosecution introduced into evidence a number of written instruments. Each of the instruments thus produced is entitled "grant deed". One of the deeds thus entitled, which was executed by appellant, will serve to illustrate the main contention of appellant on this appeal. This deed purported to convey to Myrtle F. Joyce, one of the alleged "victims" named in the indictment, 4/100ths part of the north half of the south half of lot 18, Kettleman Oil Acres, being a subdivision of the north half of the northwest quarter of section 22, township 21 south, range 17 east, M. D. B. & M. The *habendum* clause of each of these instruments is the usual clause which appears in deeds conveying a fee title to land.

It is the contention of appellant that the various instruments introduced in evidence as aforesaid were deeds

whereby interests in real property were transferred; that they do not come within the definition of "securities" as this term is defined in the California Corporate Securities Act, and that consequently there is not present in the case any evidence to justify a verdict of guilty against appellant on counts II, V and VII of the indictment.

The word "security" is defined in section 7 of the Corporate Securities Act. The portion of such definition upon which respondent relies for the claim that the grant deeds introduced into evidence come within the purview of said section is the following: "Certificates of interest in an oil, gas or mining title or lease." Respondent contends that appellant, in selling an undivided 1/100th part of one-fourth of lot 18, Kettleman Oil Acres, was selling a certificate of interest in an oil, gas or mining title or lease.

In the face of the conflicting contentions thus advanced, a recital of the factual background surrounding the execution and delivery of the deeds, as developed by the evidence presented at the trial, may be helpful. In the case before us the evidence shows that appellant, who had acquired a fee simple title to the land in which he was dealing, contacted the parties mentioned in counts II, V and VII with the statements that he was selling *units* to policyholders of International Travelers Health and Accident Association; that the company had gone into the hands of a receiver and had an oil property in litigation; that this was to be sold and distributed to the policyholders, and that the investors would get a royalty of from $35 to $40 per month for each unit purchased. The moneys paid to appellant were acknowledged by receipts given by him for *units in Kettleman Oil Acres.* Thereafter appellant delivered to the investors the instruments styled "grant deeds" representing these *units.* These deeds covered undivided interests in a quarter acre. That the consistent use of the word "unit" by appellant in his conversations and receipts is somewhat significant, cannot be doubted, because in "promotion parlance" the term "unit" is used to describe a basis of investment in a venture, and it has been construed to mean a share or undivided proportionate interest in the projects and property of the syndicate. (*Chew* v. *United States,* 9 Fed. (2d) 348; *State* v. *Summerland,* 150 Minn. 266 [185 N. W. 255].)

Having in mind the concession which must be made that the various instruments denominated "grant deeds" are in

form deeds, and that they purport to convey interests in real property; and further, that the term "securities" in its ordinary meaning does not cover deeds to real property; but remembering, as heretofore noted, that the Corporate Securities Act of California, in section 7 thereof, states that a certificate of interest in an oil, gas or mining title or lease is a "security" for the purpose of the act—we find no difficulty in concluding that the instruments under consideration here, although they are deeds in form, nevertheless in reality are nothing more or less than certificates of interest in an "oil or mining title", and that they therefore come within the category of securities as that term is defined in the statute. As was said by the District Court of Appeal, Fourth District, speaking through Mr. Justice Jennings, in an especially well considered, comprehensive and learned opinion (*People* v. *Jackson*, 24 Cal. App. (2d) 182 [74 Pac. (2d) 1085]) involving questions strikingly analogous to the ones before us, "The deeds themselves show that what was intended to be conveyed thereby consisted of fractional interests in oil which might be produced from certain described land. No attempt was made to convey any other interest in the land. Undoubtedly an owner of land may by suitable conveyance divest himself of his entire interest or a part thereof in whatever minerals may rest beneath the surface of the earth. There is nothing incomprehensible about dividing land horizontally as well as vertically. We suppose that the right of ownership of the landowner in the oil which is either known or suspected to be under the surface of the ground may be properly called an oil title just as we use the expression 'land title' to signify ownership of the surface which is the commonly accepted meaning of the expression 'land title', or 'title in land'." There is also in the record abundant evidence to the effect that defendant stated to the parties mentioned in the indictment that he wanted the vendee to buy the oil royalty, that, as one witness testified, "he wanted me to put some more money in on the oil royalty and he says I will have some big money every month".

■ Nor are we deterred from our conviction that the instruments here in question come within the meaning of the statute by the fact that section 7 of the Corporate Securities Act uses the word "certificates", while the instruments in the case at bar undoubtedly have the appearance and legal phraseology of deeds, with nothing in them indicating that

they possess the character of mere certificates; because, although the instruments are in appearance deeds, and by their terms convey more extensive rights than certificates, they in fact come within the scope of instruments which under the statute can only be dealt in after issuance of a permit by the commissioner of corporations. We are fortified in arriving at this conclusion by looking through the mere form of the instruments into the facts and circumstances which surrounded their execution as heretofore outlined. It is difficult to read these documents, together with the conversations and statements made by the defendant immediately preceding their execution, and not come to the conclusion that notwithstanding the legal verbiage in which the transaction is clothed by such documents, they are, nevertheless, securities evidencing an interest in oil property.

Appellant purchased the entire acre of land here involved for less than $500. He was selling 1/100ths of one-fourth of an acre, or multiples thereof, to purchasers in almost every instance at $32.50 per unit, which would be at the rate of $3,250 for the quarter of an acre, or $13,000 for the acre. Figuring the size of the tract of land sold to the investors, to wit, 1/100th of a quarter of an acre, we find that the purchaser would have a tract of land consisting of 108.9 square feet, or a little more than 10 feet square, of wild, unimproved land, per unit. It is at once apparent that such an interest is an unsubstantial interest, and the purchaser thereof is actually precluded from the enjoyment of that interest in any other effective way than by receiving his proportionate share of the oil produced and brought to the surface by any lessee of sufficient of the land upon which an oil well or wells could be drilled. The amount of the unit interest in the case at bar was so infinitesimal as to exclude any other possibility than that the intent of this appellant and of these investors or purchasers was to sell or purchase interests in possible oil production. In other words, what in fact is a grant deed in words and form, within the definition of a grant deed, is also in substance and effect a ''certificate of interest in an oil, gas or mining title'' within the evident purpose, intent and meaning of the Corporate Securities Act. At most, in the light of the record herein, the deed is a mere disguise. We are unwilling by our construction of the Corporate Securities Act to make the mere form of such instruments as are here before us a barrier to the carrying out of the will of the

legislature to protect the public welfare. It would be a grave misfortune if by slavish adherence to form and blind disregard of substance, the declared public policy of the state in the regulation of the sale of securities were thus nullified by this court. (*People* v. *Reese*, 136 Cal. App. 657 [29 Pac. (2d) 450]; *People* v. *Craven*, 219 Cal. 522 [27 Pac. (2d) 906]; *People* v. *Ratliff*, 131 Cal. App. 763, 772 [22 Pac. (2d) 245].) The evidence in this case satisfies us that all the transactions constituting the subject-matter of the indictment as to counts II, V and VII were simply a scheme on the part of appellant to evade the Corporate Securities Act, and that the execution and delivery of the so-called ''grant deeds'' was simply a subterfuge, because the documents in question conveyed nothing but an interest in the title to oil-bearing land, and the clearly expressed legislative intent was that such an interest should be considered a security.

■ Appellant next challenges the sufficiency of the evidence as to counts I, IV and VI, on each of which he was convicted of the crime of grand theft. In that connection, our inspection of the record reveals the fact that the incriminatory evidence, as it affected the offense charged in count I of the indictment, in substance was that the appellant represented to Myrtle F. Joyce that he was selling units for the Travelers Health Association at $32.50 per unit; that the association in question had gone into the hands of a receiver, at which time they had 80 acres in litigation; that Mrs. Joyce would get a royalty of $35 to $40 per month on each unit. There was also testimony to the effect that Mrs. Joyce relied upon the representations thus made.

■ As to count IV, the record indicates that the appellant made practically the same representations as above set forth to Mrs. Mary Graham, she testifying as follows: ''He said I have some big income if I put that money in.'' When the witness was asked whether appellant stated what the money was to be used for, she said he replied, ''For the oil royalty.'' Further in the testimony of this witness we find her stating that on one occasion during a conversation with appellant, ''he wanted me to put to some more money in on oil royalty, and he says I will have some big money every month. . . . I was going to start getting some the next month''. When asked by the district attorney, ''Did you believe the statements made to you by Mr. Daniels regarding this land as being oil land?'' the witness replied, ''Well, the way he told

me, I thought I would get a large income every month like he told me." Moreover, in connection with the evidence as to this count, we find in the record the following:

"Q. Mr. Daniels told you if you would buy those per cents you would have a large income, and you relied upon that statement, that is why you purchased these per cents and turned over the money?

"A. Yes.

"Q. And that was the only reason you delivered the money over?

"A. Yes, because he said it was producing oil and I would have some big income every month.

"Q. He said it was producing oil at that time?

"A. Yes.

"Q. That particular land was producing oil?

"A. Yes, that is what he said."

It might here be noted in connection with count IV that there was evidence of the falsity of the statements of the defendant that this particular land was producing oil. This testimony was supplied by a petroleum geologist, who stated that the nearest production on the west was $1\frac{1}{2}$ miles, to the north 20 to 25 miles, and to the east 60 miles or so; and the same witness also testified that the particular land involved here lies in the San Joaquin Valley and will furnish agricultural products if irrigated.

As to count VI, the indictment charged the wilful, unlawful and felonious taking of another and different sum from Mary Graham than that mentioned in count IV, and that the taking was upon another and different occasion than that mentioned in count IV, and the representations made were similar to those testified to in connection with said count IV.

It is more than doubtful that any of the representations or all of them combined, as applied to count I, may be said to measure up to the standard defined by judicial interpretation of the statutes which relate to the crime of theft committed by means of false pretenses. In 12 California Jurisprudence at page 452 the rule is declared to be "that the representation must be of a present or past fact, not a mere expression of opinion, *or a representation of an act to be performed in the future,* as a mere promise to pay or perform some act . . . ". It is the universal rule that the false pretenses must relate to a past or existing fact, and that the

crime is not committed where the inducement is a promise to perform some act in the future, such as promising a future return upon money invested, such as was guaranteed by the defendant herein, so far as count I is concerned. (24 A. L. R. 402; *People* v. *Mace,* 71 Cal. App. 10, 21 [234 Pac. 841] ; *People* v. *Reese, supra*; *People* v. *Kahler,* 26 Cal. App. 449 [147 Pac. 228] ; *People* v. *Green,* 22 Cal. App. 45 [133 Pac. 334] ; *In re Jones,* 47 Cal. App. 205 [190 Pac. 466] ; *People* v. *Walker,* 76 Cal. App. 192, 205 [244 Pac. 94] ; and authorities there cited.) The evidence, therefore, as to count I of the indictment, is insufficient to sustain the judgment.

Measured by the aforesaid standards, the unequivocal representations testified to as having been made by appellant as to material present and existing facts, the falsity of which was established, amply sustain the judgments as to counts IV and VI.

■ Appellant further complains that the court fell into error in permitting the prosecution to introduce into evidence certain deeds; but upon the authority of sections 1948, 1951 and 1963 of the Code of Civil Procedure, and section 1102 of the Penal Code, appellant's contention in this respect is without merit. (See, also, *Thomas* v. *Fursman,* 177 Cal. 550 [171 Pac. 301] ; *Ware* v. *Julian,* 122 Cal. App. 354 [9 Pac. (2d) 906] ; *Davis* v. *Pacific Improvement Co.,* 118 Cal. 45, 49 [50 Pac. 7].) At his trial appellant at no time denied the due execution or delivery of the documents offered and introduced into evidence, nor did he attempt to explain them in any way; and when these matters were touched upon on cross-examination of appellant, objection was made by his counsel, which objection was sustained by the trial court on the ground and for the reason that the matter had not been touched upon on direct examination. Other evidence elicited during the trial, which was neither denied nor explained by appellant, was sufficient to establish the foundational facts necessary to warrant the trial court in admitting the documents into evidence.

For the reasons herein set forth, it is ordered that the judgment of conviction herein upon count I and the order denying appellant's motion for a new trial upon that count are reversed; it is further ordered that the judgments of conviction upon the other counts of the indictment be, and each of them

is, affirmed, and the order denying appellant's motion for a new trial as to all counts other than count I is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 28, 1938, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 17, 1938.